**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | &#124; |
| | &#124; |
| **v.** | &#124;    **1:24-cr-00101-AJT** |
| | &#124; |
| **RUSSELL R. VANE, IV,** | &#124; |
| | &#124; |
| **Defendant.** | &#124; |

### DEFENDANT'S POSITION ON SENTENCING

### Introduction

"*I have great faith in fools — self-confidence my friends will call it*." –Edgar Alle Poe

To say that Mr. Vane's decisions in this case were foolish is an understatement. He never should have attempted to make ricin. Although he never had any intent to harm anyone, Mr. Vane knows he endangered his family during his misguided experiment in early 2023 and he sincerely understands that now. His decision to plead guilty to a felony and accept responsibility for his actions are indicative of that understanding. But he would still like the Court to try to understand how he got to a place in his mind where he would *ever* think it was a good idea. It's not easy to explain because Mr. Vane is not even sure. All he knows that he was not himself.

Leading up to the events of this case, Mr. Vane had experienced a global pandemic, a several-months lockdown, his second divorce, isolation, loneliness, and witnessed war breakout in Europe when Russia invaded Ukraine.[1] In addition, Russia's

---

[1] Lopez, C.T., *Two Years in, Russia's War on Ukraine Continues to Pose Threat to Global Security*, U.S. Dept. of Defense (available at https://www.defense.gov/News/News-

leader-dictator continually issued implied threats regarding the use of nuclear weapons.[2]

Mr. Vane, as an NGA analyst, had a front row seat for these events.  Global turmoil and

world disasters brought Mr. Vane's mind to a dark place.  Much like a large percentage

of American society, Mr. Vane's mental health was negatively impacted from the COVID-

19 global pandemic.[3]  He also experienced sadness and depression after his second

marriage ended.

Most people view stories about the apocalypse or the collapse of civilization as

pure fantasy or conspiracy theories.  But considering the course of world events over the

last few years, it is certainly not hard to imagine regular people thinking about the "end

of the world," or at least another world war.  This is what led Mr. Vane down the path of

intrigue regarding militias and "prepper" groups.  It is also what partially spawned his

curiosity with whether it was possible to make ricin, an experiment that was abandoned

and forgotten.  To Mr. Vane, it seemed like the world was burning and he wanted to be

prepared.

But this case has been excruciatingly sobering and Mr. Vane has "snapped out of

it."  He had a lot of time to think and reflect during his four months of incarceration,

---

Stories/Article/Article/3686148/two-years-in-russias-war-on-ukraine-continues-to-pose-threat-to-global-security/) (last accessed 10/25/2024).

[2] Trevelyan, M., *Putin's nuclear warnings since Russia invaded Ukraine*, Reuters, available at https://www.reuters.com/world/europe/putins-nuclear-warnings-since-russia-invaded-ukraine-2024-03-13/ (last accessed 10/25/2024).

[3] Since the onset of the COVID-19 pandemic, at least 41% of adults have experienced high levels of psychological distress at least once. Pew Research Center, available at https://www.pewresearch.org/short-reads/2022/12/12/at-least-four-in-ten-u-s-adults-have-faced-high-levels-of-psychological-distress-during-covid-19-pandemic/ (last accessed 10/22/2024).

often locked down 23 hours a day because of his charges.  Mr. Vane sought to accept responsibility in this case from the moment he was arrested.  When the Government offered him the opportunity to cooperate, Mr. Vane did so.  When the Government offered Mr. Vane a reasonable plea, he accepted it.  He has done these things so the Court knows, when he says he regrets his actions and is remorseful, that Mr. Vane is very serious.

While it can be said that Mr. Vane's case is one for mercy, it can even more accurately be described as one for fair and reasonable justice.  He did possess ricin without the required certification, but the impact of his crime, the actual harm, is almost non-existent.  Sadly, the only ones who have been harmed are the defendant himself, and his family.  Moreover, as the Court will see, Mr. Vane's positive contributions to his community, to the United States Marine Corps, and to the U.S. Government vastly outweigh his wrongs.  There are a variety of reasons, discussed below, to sentence Mr. Vane to time-served, or alternatively, to authorize, if necessary, any additional confinement to be served on home detention, allowing Mr. Vane to continue the outstanding rehabilitation he has demonstrated as a husband, father, and provider since the Court allowed his release on bail following his plea of guilty in August.

## BACKGROUND

The facts of this case are well known by the Court.  The impetus for the Government's investigation was a report on a YouTube channel called "News2Share" by

members of a local "prepper"[4] militia, the Kekoas, that Mr. Vane had provided them with "Unclassified, For Official Use Only" documents containing instructions on methods to create homemade, small-arms gunpowder, not at all uncommon among gun enthusiasts. This occurred on or about April 1, 2024 and the Government immediately began investigating Mr. Vane.  After meeting with several members of the Kekoas on April 3, 2024, the FBI then obtained a search warrant to search Mr. Vane's home in Vienna, Virginia for evidence related to explosive devices.  On April 10, 2024, the FBI conducted the search of Mr. Vane's home, but did not recover any evidence of explosive devices or explosives.  However, law enforcement officers did find a substance suspected to be ricin, an illegal toxin, and they arrested Mr. Vane after the search.

Mr. Vane was held without bail from his arrest date until his plea hearing in "administrative separation" at the Alexandria Detention Center that was unnecessary and severely debilitating to him.  On August 21, 2024, Mr. Vane appeared in this Court and pleaded guilty to Count 3 of the Indictment, charging Possession of a Select Agent by an Unregistered Person (ricin), in violation of 18 U.S.C. § 175b(c)(1).   The remaining counts of the indictment related to explosive devices and weapons were dismissed.  This Court released Mr. Vane to home confinement based on the changed posture of the case and the Government's representations that Mr. Vane was not a danger to his community, nor a flight risk.  Mr. Vane appears in this Court for sentencing on November 13, 2024.

---

[4] Prepper: a person who gathers materials and makes plans in preparation for surviving a major disaster or cataclysm (such as worldwide economic collapse or war).  Merriam-Webster Online Dictionary at www.meriam-webster.com.

## OBJECTIONS TO THE SENTENCING GUIDELINES

Mr. Vane objects to the calculation of his Guidelines as performed by the PSR writer.  Dkt. 55, Draft PSR, ¶¶ 48-58.  Specifically, Mr. Vane objects to not receiving an additional two-point reduction (-2) for being a zero-point offender.  *See* ¶¶ 55; U.S.S.G. § 4C1.1.

### Mr. Vane is zero point offender

Mr. Vane objects to Mr. Vane not receiving an additional negative two points (-2) for being a zero-point offender.  U.S.S.G. § 4C1.1.  The PSR writer disqualified Mr. Vane under 4C1.1(a)(7) for possession of a "dangerous weapon."  However, the substance that Mr. Vane possessed, which simply tested "positive" for ricin, does not qualify as a "dangerous weapon" under the Guidelines.  He should therefore receive the two-point reduction.

Mr. Vane would seem to qualify as a zero-point offender assuming his case did not involve a "dangerous weapon."  See § 4C1.1(a) factors.  A "dangerous weapon" is defined as:

> (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g., a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

App. n.1(E), 1B1.1.  There is no evidence that the substance found in Mr. Vane's home is capable of "inflicting death or serious bodily injury."  Again, the Government is only able to say the substance tested positive for ricin.

The Government has done no testing on toxicity, particle size, or biological activity, which are extremely important factors in determining the harmfulness.  Further, Mr. Vane possessed no delivery device to inject another person intravenously or intramuscularly, the size of the particles was too large for inhalation, and dermal exposure carries very little toxicity.  This is supported by the opinion of an expert toxicologist, Dr. Edward W. Boyer, who reviewed the lab materials and other discovery related to Mr. Vane's case.  *See* Exhibit 1, Ltr of Dr. Boyer.  As stated by Dr. Boyer, "Mr. Vane was incapable of producing ricin of sufficient purity or in a form that would be lethal to humans."  Based on Dr. Boyer's review of the case, Mr. Vane did not have the specialized equipment necessary to produce lethal ricin and the substance he created did not possess the physical qualities of such a substance.  Other expert toxicologists, like Dr. Steven Bird, have issued almost identical opinions in similar cases, i.e., "producing highly purified and biologically active ricin is extremely challenging."  *See U.S. v. Milzman*, 1:14-cr-186, Dkt. 36, Ex. F (D.D.C. 2014).  The information available does not show that this substance qualifies as a "dangerous weapon."  We therefore ask that you grant Mr. Vane two-point reduction for being a zero point offender.

<u>**ARGUMENT ON SENTENCING FACTORS**</u>

Since the Guidelines were held to be advisory in *United States v. Booker*, 543 U.S. 220, 226 (2005), imposing a sentence is no longer a strictly mathematical exercise. While "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines," *United States v. Hughes*, 401 F.3d 540, 546 (4th. Cir. 2005), district courts must now make "an individualized assessment based on the

facts presented" after calculating the advisory Guidelines range.  *Gall v. United States*, 552 U.S. 38, 50 (2007).

The Guidelines range is but one of several factors a court must consider when imposing a sentence and it is legal error to treat those ranges as default sentences.  *See United States v. Mendoza-Mendoza*, 597 F.3d 212, 216-17 (4th Cir. 2010); *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam); *Spears v. United States*, 555 U.S. 261, 263-64 (2009).  A court must also weigh the factors enumerated in 18 U.S.C. § 3553(a) when imposing a sentence.

When considering the factors enumerated in § 3553(a), which state that a judge must "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)), courts are not required to point to "'extraordinary' circumstances to justify a sentence outside the Guideline range." *Gall v. United States*, 552 U.S. 38, 47 (2007).  A below-Guidelines sentence may be appropriate if the Court determines that the Guideline sentence "falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines . . . fails to properly reflect § 3553(a) factors." *Rita v. United States*, 551 U.S. 338, 351 (2007)(citation omitted).

The factors for the district court to consider include:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6)

the need to avoid unwarranted disparities among similar offenders; and (7) the need to provide restitution to victims.  18 U.S.C. § 3553(a).  The Court must weigh each of these factors when determining the appropriate sentence with the least amount of imprisonment necessary pursuant to § 3553(a).  *Id*.

**The Nature and Circumstances of the Offenses**

The investigation into Mr. Vane ended in a very different place than where it began.  On April 1, 2024, the FBI watched a video on a YouTube channel called "News2Share."  The video was a news report about Mr. Vane and his alleged attempts to "entrap" members of the Kekoas militia by allegedly distributing confidential government documents related to the creation of explosives.  The Government immediately began investigating Mr. Vane; but Mr. Vane also knew about the news report on April 1st.  At that time, he knew his life would likely be scrutinized by multiple organizations, including his employer the National Geospatial-Intelligence Agency (NGA).  Mr. Vane hired an attorney almost immediately because of the issues he anticipated with his employer.  Before that, he also took some ill-advised steps to avoid further notoriety, including applying with the Circuit Court to change his name and issuing a fake obituary.

All of this is to say Mr. Vane was well-aware he would be investigated.  The FBI would eventually learn that Mr. Vane was not creating explosives of any kind and that he did intend to harm anyone.  The FBI searched Mr. Vane's home and found no explosives or explosive devices as they had anticipated.  The FBI did find ricin, but only because Mr. Vane had done nothing to dispose of the substance in his laundry attic room even though he was well-aware he was being investigated by federal law enforcement authorities.  He

8

had created the ricin approximately a year earlier and had not touched it since.  It was in a closed test tube in a box high on a shelf in the laundry attic room.  Mr. Vane forgot about the concrete-like substance because he never intended to use it for any purpose and certainly not to hurt anyone.  However, it was illegal – a fact unknown to Mr. Vane at the time, and which, frankly, he never even contemplated.  What would eventually become clear to the Government is that Mr. Vane not the threat the Kekoas had portrayed, nor the threat that the FBI had moved quickly to address and neutralize.

Mr. Vane's misguided experiment happened almost a year earlier.  Mr. Vane was at the height of his interest in prepper activities.  He was going through a time where he thought often about what would happen if society began to collapse; if people lost basic government services like power, water, infrastructure, police, etc.  Mr. Vane was reading a lot of information on the internet from dubious sources and of questionable credibility related to survival techniques, strategies, and tactics.  In Mr. Vane's mind at that time, testing the instructions for creating ricin was almost like testing the credibility of the information – would it actually work.  His military training also predisposed him to think about how to deal with the most dangerous possibilities.  It is really hard for him to explain why he created this substance other than a scientific curiosity, i.e., could potential terrorists make this stuff.  Mr. Vane wanted to know if it would work.

After he completed his experiment, Mr. Vane packed this off-white paste into a large test tube thinking there is no way this stuff, which later hardened like concrete, could be ricin.  Obviously, he was wrong, but he even tested a small portion on his skin with no reaction.  Thinking his experiment had failed, Mr. Vane slept easier thinking that

people with an intent to harm anyone could not manufacture this substance.  But he did nothing with the substance – it sat there in his laundry room attic for almost a year until the FBI searched his home.  And according to an expert toxicologist, Dr. Boyer, the substance could not have been lethal to humans.  Furthermore, even if the substance qualified as "crude and impure ricin," Mr. Vane did not have a sufficient quantity to manufacture lethal ricin.  See Exhibit 1.

Mr. Vane had also been experiencing personal issues at that time.  His second marriage ended in 2021.  His strained relationship with his first wife, with whom he has two teenage sons, was continually deteriorating.  The pandemic perhaps had a larger effect on Mr. Vane than he realized at the time.  The isolation and lack of social interaction drove him more to the internet than in the past.  Mr. Vane would tell you that COVID "broke his brain," but this is an oversimplification.  In anticipation of sentencing, Mr. Vane met with and was evaluated by Dr. William Stejskal.  As stated by Dr. Stejskal, Mr. Vane spoke about his involvement with the Kekoas with "feelings of shame and/or chagrin," indicating an appropriate reflection on his actions.  *See* Exhibit 2, Ltr of Dr. Stejskal.  Further, Dr. Stejskal did not observe any "[s]erious symptoms of major mental illness, such as delusional beliefs, hallucinations, disorganized thinking, etc."  Based on Dr. Stejskal's psychological testing, Mr. Vane had no indications of antisocial thinking, psychosis, psychotic symptoms, interpersonal aggression, aggressive/antisocial attitudes, or inflated self-esteem.  Mr. Vane would certainly benefit from counseling and therapy and there is a high probability that Mr. Vane can once again be a very productive member of our community.  There is simply no indication

that Mr. Vane or society would benefit from him being further incarcerated.

## Mr. Vane's Personal History and Characteristics

Mr. Vane was born in Fairfax, Virginia in 1982.  He has lived his entire life in the northern Virginia area, aside from his time in college.  Mr. Vane was raised in Fairfax by his parents and has one younger sister.  He attended high school at Langley High School in McLean, Virginia and participated in rugby and student clubs like the innovation club and the physics society.  Mr. Vane tore several knee ligaments, the ACL and MCL, playing rugby in high school.  While going through his primary education, Mr. Vane suffered from a learning disability and developmental delays, but he was able to overcome these issues with counseling services from Fairfax County.  He graduated high school in 2000 with an advanced studies diploma.

After graduating high school, Mr. Vane attended Longwood College in Farmville, Virginia (B.S. Economics) and Texas A&M University in College Station, Texas.  He obtained his Master of Science in Economics from Texas A&M in 2005.  Thereafter, Mr. Vane returned to Virginia to begin is career.  Mr. Vane was generally employed as an economic analyst after college until about 2009, when he began work in consulting. Several years of consulting work led Mr. Vane to his employment with the National Geospatial-Intelligence Agency (NGA), with which he had previously worked as a consultant, in Springfield, Virginia as a data engineer.  He was a contractor with NGA from 2014 to 2017, a student at National Intelligence University (NIU) between 2016-2017, and career employee from 2017 to 2024.

Prior to beginning his consulting career, Mr. Vane enlisted in the U.S. Marine Corps Reserves in 2008 and attended boot camp at Parris Island.  He served eight years in the Reserves as an intelligence specialist and completed a successful overseas deployment.  He received an honorable discharge from active duty in 2017 and completed his reserve obligation in 2020.  During his service, Mr. Vane was awarded the Selected Marine Corps Reserve Medal, National Defense Service Medal, Global War on Terrorism Service Medal, Navy and Marine Corps Overseas Service Ribbon, Expert  Rifle Qualification Badge, and Sharpshooter Pistol Qualification Badge.  Mr. Vane was also nominated for Joint Service Commendation Medal for his work at NGA.  *See* Exhibit 3, Vane Citation.

While living in College Station, Texas, Mr. Vane met and later married his first wife in 2004.  Their marriage produced two sons, Richie (age 17) and Jimmy (age 13):

[next page]



Ultimately, their marriage did not work out and unfortunately, Mr. Vane's relationship

with his ex-wife has been strained and contentious.  Mr. Vane hoped to improve their

relationship for the sake of their eldest son, who has struggled with depression.  Mr.

Vane's ex-wife has previously filed unfounded allegations with Child Protective Services

to try to limit Mr. Vane's contact with his sons, but no actions were taken and he

retained custody.  In light of this case, she has filed for additional amendments to their

custody agreement, asking again to limit Mr. Vane's contact with his children.  Mr. Vane was married a second time from 2017 to 2021.  He and his second wife had no children and although their relationship ended on good terms, it was still very difficult for Mr. Vane.

Mr. Vane met his current wife shortly thereafter and they immediately hit it off.  Mr. Vane's wife shared many of the same interests as Mr. Vane and they felt like a very good fit for each other.  They decided to get married and gave birth to their daughter, Freya, in March 2022.  She was the little angel they were waiting for:



The year after, the couple were expecting their second child.  Although they were expecting their son, Ajax, near Christmas of 2023, he ended up coming much earlier when Mr. Vane's wife gave birth at 33 weeks.  Ajax had to stay in the Neonatal Intensive Care Unit (NICU) for over six weeks, but he is perfect to them.



Ajax has special needs due to complications from his premature birth.  He is still undergoing physical therapy on a regular basis to address his developmental issues.  Since Mr. Vane's wife works full-time, she requires substantial assistance to meet the needs of Freya and Ajax.  The family's ability to successfully function is reliant on Mr. Vane's ability to work and assist with family responsibilities and its functioning has substantially improved since Mr. Vane returned home.

Mr. Vane has wasted no time trying to rebuild his life.  Although not glamorous, and even while limited on home confinement, Mr. Vane was able to obtain employment with a water treatment and plumbing business.  From initial reports, he has been performing extremely well and making enough to help support his family.  Mr. Vane has already made substantial progress towards rehabilitation.  This should speak loudly to the Court about Mr. Vane's ability to rededicate to providing for his family and being a

productive member of his community.

### The Need for the Sentence Imposed

Mr. Vane has never served a sentence of confinement before, aside from the time he spent in pre-trial confinement prior to pleading guilty. It is worth noting that the majority of Mr. Vane's time in pre-trial confinement was spent in administrative separation, i.e., high security, due to the nature of his original charges, meaning his was generally locked down 22 to 23 hours a day inside his cell. This was very hard time for Mr. Vane. Pursuant to the sentencing statute, Mr. Vane's sentence should be designed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2). A felony conviction and a sentence of time served will certainly reflect the seriousness of his offense. Mr. Vane has already lost an important and fulfilling job at NGA, to which he dedicated a decade of his life and which paid considerably more than he now earns. Moreover, such a sentence will deter others and protect the public from others who might foolishly choose to create such a toxin. With respect to specific deterrence, Mr. Vane has tried to express to this Court the remorse and embarrassment he feels and what he has learned from this event. He will also address the Court directly at his sentencing hearing on this issue. Further incarceration is simply not necessary.

Additionally, as the Second Circuit noted, a defendant who has previously been sentenced to minimal incarceration, might very well be deterred by a lesser amount of

incarceration than someone who has shown themselves to be undeterred by a lengthy sentence. *See United States of America v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001). Again, Mr. Vane's has never before spent any time in jail or prison. Therefore, even a very small amount of confinement carries enough deterrence, and Mr. Vane has already experienced a very tough period of confinement.

Under the circumstances of this case, a time-served sentence will promote Mr. Vane's respect for the law and provide a just punishment. Mr. Vane has served enough time on incarceration to know he never wants to go back. Moreover, the research shows that lengthier prison sentences do not prevent recidivism. "[H]aving pulled together the best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). "Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences, they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism." Valerie Wright, *Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* (2010).[5]

---

[5] Available at https://webpage.pace.edu/jhumbach/Crim-SentencingProject%20ReportonDeterrence.pdf (last accessed March 8, 2023).

Even the Sentencing Commission itself acknowledged this fact. "There is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004). And perhaps most notably, the Department of Justice has tacitly acknowledged this fact: "[C]onfinement or increased length of incarceration served the crime control purpose of incapacitation but had little or no effect as a 'treatment' with rehabilitative or specific deterrent effects." Don M. Gottfredson, U.S. Department of Justice, National Institute of Justice, *Effects of Judges' Sentencing Decisions on Criminal Cases*, Research in Brief 9 (Nov. 1999).

In accordance with § 3353(a), a sentence of time served is sufficient, but not greater than necessary, to reflect the seriousness of the case and achieve the Court's goals of specific and general deterrence. However, if the Court decides additional incarceration is warranted, it should order that term to be served in a manner which allows Mr. Vane to continue to meet the needs of his family by being at home, working, and assisting his wife in caring for his children and maintaining a household.

## The Kinds of Sentences Available

Although not the sentencing range recommend by the Guidelines, a sentence of time-served is authorized under the statute of conviction in this matter. PSR, ¶ 99, p. 23. If the Court feels it is necessary, it can also opt for a longer period of supervised release. In this case, the Court can sentence Mr. Vane to a maximum of three years of supervised release. PSR, ¶ 99, p. 23. The Court may also assess a fine of up to $250,000 and a

18

$100 special assessment.  Mr. Vane humbly requests that the Court not assess a fine in this matter, as the family has already suffered a substantial financial penalty in terms of their loss of income and significant legal costs.

<u>**The Sentencing Guidelines & Pertinent Policy Statements**</u>

The Sentencing Guidelines range should be viewed critically against Mr. Vane's actual conduct.  After considering the actual harm done and Mr. Vane's admitted conduct, a downward variance in this case is warranted.  Should the Court sustain Mr. Vane's objection to the calculation of his guidelines, his offense level would be 17 and his sentencing range would be between 24 and 30 months.  Defense counsel asserts this is still an inflated level for the nature of Mr. Vane's offense, which is essentially a regulatory crime.  A much lower sentence is appropriate considering all of the sentencing factors in § 3553(a).

In that regard, the U.S. Sentencing Commission and Congress have made substantial amendments to portions of the Guidelines applicable to Mr. Vane's case.[6] First, the Commission added new Guideline section 4C1.1, under Chapter 4—Criminal History, which provides for the *decrease* of two offense levels if the defendant meets all of the required criteria.  U.S.S.G. § 4C1.1; *see also* U.S. SENT'G COMM'N, Amendments to the Sentencing Guidelines, Retroactive Application, pp. 1-2 (Aug. 31, 2023) (explaining

---

[6] Counsel raises the recent U.S.S.G. Amendments in furtherance of Mr. Vane's argument for a variant sentence.  Indeed, given that the Sentencing Commission has seen fit to change how the guidelines apply to individuals with no criminal history points (such as Mr. Vane) through new § 4C1.1 and § 5C1.1 App. n.10(B)—explicitly making the recommended Guidelines Sentences for this class of individuals more lenient across the board—the requested variant sentence in Mr. Vane's case is all the more warranted.

that the effective date of § 4C1.1 was Nov. 1, 2023, because "the policy reasons underlying []the amendments apply with equal force to individuals who are already sentenced;" while also stating that the amendments to the Guidelines recognize the fact that "*individuals with zero criminal history points have considerably lower recidivism rates than other sentenced individuals*") (emphasis added).[7]

Indeed, underpinning its rationale for drafting § 4C1.1, the Sentencing Commission stated that "[r]ecidivism data analyzed by the Commission suggest that offenders with zero criminal history points ("zero-point" offenders) have considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point." U.S. SENT'G COMM'N, Amendments to the Sentencing Guidelines—Preliminary, pg. 71-72 (April 5, 2023).[8]

Moreover, in addition to the changes in Chapter 4, the Commission also added new Application Note 10(B) to §5C1.1 (Imposition of a Term of Imprisonment) addressing "nonviolent first offenders" such as Mr. Vane.  Specifically, the new application note provides:

> "A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense."

---

[7] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202308_RF-retro.pdf.
[8] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.

App. n.10(B), U.S.S.G. § 5C1.1.  For all of these reasons, a time-served sentence is appropriate.

<u>Mr. Vane's Employment Record</u>

Mr. Vane's employment record supports his request for home confinement.  The Guidelines specifically state "Employment record may be relevant in determining the conditions of probation or supervised release (e.g., the appropriate hours of home detention)."  U.S.S.G. § 5H1.5, *Employment Record (Policy Statement)*.  Therefore, Mr. Vane asks the Court to consider this policy statement from the sentencing commission and Mr. Vane's substantial employment record, including his ability to seek and maintain employment while on home confinement.

<u>Mr. Vane's Military Service</u>

Mr. Vane's military service also weighs in favor of his requested variance.  The Guidelines state "Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."  U.S.S.G. § 5H1.11, *Military, Civic, Charitable, or Public Service; Employment-Related Contributions; Record of Prior Good Works (Policy Statement)*.  Mr. Vane served eight years in the U.S. Marine Corps honorably and received several awards.  He also completed an overseas deployment.  He respectfully asks the Court to consider his military service in making its decision regarding the appropriate punishment in this case.

## The Need to Avoid Unwanted Disparities

Cases that involve the possession of ricin are not common.  Mr. Vane, through counsel's research, was able to locate less than 20 cases.  The majority of these cases, twelve, were charged under 18 U.S.C. § 175 (Prohibitions with Respect to Biological Weapons), which requires and intent to use a toxin as a weapon or for other "non-peaceful purpose."  These cases deal with defendants were who were producing or selling ricin with the intent to harm.  These cases are completely inapposite to Mr. Vane's behavior and culpability.  There were only six cases charged under 18 U.S.C. § 175b (Possession by Restricted Persons), which makes possession of a toxin illegal without the required registration.

Upon a survey of those cases, Mr. Vane argues that his circumstances are most similar to the facts of *United States v. Milzman*, No. 1:14-cr-186 (D.D.C. 2014).  In that case, a college student produced ricin in his dorm room using instructions he found online; law enforcement found out a month later on a tip from another student.  *Id.*, Dkt. 1-1 (Complaint) at 3-4.  He apparently was going to use the substance to attempt suicide, but not to harm anyone else in his dorm.  *Id.*, Dkt. 36 at 2.  That court sentenced Mr. Milzman to one year incarceration followed by three years of supervised release.

Other than the *Milzman* case, other cases that this Court should consider in determining a sufficient sentence for Mr. Vane are:

| Case | Offense(s) | Description | Sentence |
|------|-----------|-------------|----------|
| *US v. Miller*<br><br>2:17-mj-106 | 18 USC § 175b(c) | Defendant, a 70-year-old woman who lived in a retirement home, made ricin in her apartment in an effort to commit suicide. She attempted to "test" her substance on other residents in her retirement home, | 5 years probation |

| D. Vt. 2018 | | but not developed any symptoms. Defendant had mental health issues. | (time served pretrial was approx. 9 months) |
|---|---|---|---|
| *US v. Layman*<br><br>5:17-cr-156<br><br>W.D. Okla. 2018 | 18 USC § 175b(c) | Defendant attempted to hire someone on Craigslist to murder her ex-husband, who lived in Israel, over a child custody dispute. She was originally charged with murder for hire as well, but that was dismissed pursuant to her plea agreement. | 37 months |
| *US v. Siers-Hill*<br><br>2:18-cr-62<br><br>E.D. Va. 2019 | 18 USC § 175b(c) | Police search a storage unit belonging to defendant, a 68-year-old woman, and found ricin in a container and syringes, including one containing identifiable traces of ricin, numerous other liquid chemicals and powdered caffeine, latex gloves, packages of castor plant seeds, and three firearms, one of which had an obliterated serial number. | 35 months |

Mr. Vane is arguably less culpable than Mr. Milzman and Mrs. Miller because Mr. Vane never intended to harm anyone, not even himself.  And Mr. Vane was likewise experiencing mental health issues at the time; he has admitted as much and sincerely believes he would benefit from counseling and therapy.  The *Layman* and *Siers-Hill* cases, although pleaded down to an offense under § 175b(c), still clearly involve an intent on the part of those defendants to harm other people, which is not present in Mr. Vane's case.  That is why his case is so different than prior cases in which defendants received guidelines sentences.

Mr. Vane is in his early 40s and considerably older than Mr. Milzman, but he has virtually no criminal record.  Moreover, he has shown a strong dedication to his community and country.  He is extremely likely to learn from this mistake quickly, of which the Court already has substantial evidence.  Mr. Vane's actions post-release should

inform the Court's view of Mr. Vane's character.  Once he received the opportunity to again take care of his family, he did not rest on his laurels, he got back to work.  This Court should understand that Mr. Vane will work the rest of his life to never stand before it again as a criminal defendant.

<u>**CONCLUSION**</u>

Mr. Vane respectfully requests that the Court impose a variant sentence of time served, or alternatively, to order any remaining term of confinement to be served on home confinement.

Respectfully submitted,
RUSSELL R. VANE, IV
By Counsel

_____/s/_____
Yancey Ellis (VSB 70970)
Robert Moscati (VSB 95648)
Counsel for Defendant
108 N. Alfred Street, First Floor
Alexandria, Virginia 22314
703.684.7908
yancey@carmichaellegal.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 6, 2024, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

_____/s/_____
Yancey Ellis

# EXHIBIT 1

Robert C Moscati, Esq.
The Moscati Law Firm
1818 Library St, Suite 500
Reston, VA  20190


Dear Mr. Moscati:

I am writing in response to your request for me to review and opine regarding the circumstances of Russell Richardson Vane IV's possession of ricin on April 10, 2024.

I am a board-certified medical toxicologist. I received my doctorate in chemistry from Columbia University (PhD, 1988) and was a NIH postdoctoral fellow in protein design at The Rockefeller University.  After graduating from Columbia University College of Physicians and Surgeons (MD, 1995), I completed residency training at the University of Pennsylvania. I was a fellow in medical toxicology at Harvard University from 1999-2001. From 2001-2016, I directed the Division of Medical Toxicology at the University of Massachusetts Medical School. From 2017-2021, I was the Director of Research at Brigham and Women's Hospital where I promoted to Professor, Harvard Medical School. At present, I am Professor with Tenure at The Ohio State University and a staff toxicologist at the Central Ohio Poison Center. Over the course of my career, I have directly managed several ricin exposures which occurred as attempts at self-harm.  It is on the basis of my education, training, and clinical practice, and my review of the FBI lab reports, 302s, and other information you have provided me, that I have formed these opinions.

Mr. Vane was incapable of producing ricin of sufficient purity or in a form that would be lethal to humans. Ricin is a toxalbumin of such exceptional toxicity that it has been considered a mass casualty threat. The toxicity of ricin depends on several factors, including the manner of delivery (e.g., inhalational, intravenous, intramuscular, administration), the amount of ricin absorbed by the body after exposure, the mass of the ricin particles (if inhaled), and the animal species in which testing was conducted. The median lethal dose of ricin varies greatly by animal species; in studies involving inhalational exposure to ricin, a lethal dose ranged between 10 and 300 *micro*grams of ricin and required very small particle sizes to enter the lungs.  In contrast, oral administration of ricin identified that 30milligrams—*over 1000 times more ricin*—was needed to produce toxicity. Moreover, ricin powder of 1-2 microns in diameter is needed for effective inhalational administration as larger sized particles deposit in the larger airways and do not travel to the alveoli where absorption of the toxin occurs.

These requirements of micron-sized particles of high purity are difficult to obtain. Manufacturing ricin of this purity requires specialized separation equipment, none of which was found in Mr. Vane's possession. Making ricin powder of 1-2 micron-sized particles similarly requires specialized equipment that Mr. Vane not own.  Even if Mr. Vane had sufficient amounts of crude and impure ricin to produce toxicity—and he did not—he lacked the manufacturing capability to make an effective toxin.

Furthermore, Mr. Vane did not possess an effective delivery mechanism. First, the large particle size of crude ricin extract cannot penetrate the alveoli to produce toxicity. Second, Mr. Vane possessed no means for intravenous or parenteral administration. Finally, Ricin in contact with skin is utterly inactive.  Oral administration of crude ricin produces little to no toxicity; the experience of medical toxicologists who have managed individuals attempting self-harm with crude ricin is that if any effect arises from ingested ricin, it is limited to mild diarrhea.

I am able to defend rigorously these conclusions, made within a reasonable degree of medical and toxicologic certainty, in any U.S. court of law. I reserve the right to supplement, amend or addend these opinions based on additional or new information including other expert reports.

Edward W. Boyer MD PhD

# EXHIBIT 2

<u>UNDER SEAL</u>

# EXHIBIT 3

NATIONAL GEOSPATIAL-INTELLIGENCE AGENCY



CITATION TO ACCOMPANY THE AWARD OF

THE JOINT SERVICE COMMENDATION MEDAL

TO

RUSSELL R. VANE

Staff Sergeant Russell R. Vane, United States Marine Corps Reserve, distinguished himself by exceptionally meritorious service as an All-Source Intelligence Specialist, Insider Threat Office, National Geospatial-Intelligence Agency, from April 2016 to October 2016.  During this period, Staff Sergeant Vane provided over 200 hours of support to the Financial Management Directorate and assisted in the development of the Insider Threat Executive Round Table.  His efforts brought together nine government agencies and led to the changing of Insider Threat policies and procedures across the entire Intelligence Community.  Staff Sergeant Vane developed and deployed an agency wide software package capable of providing the Financial Management Directorate with increased fiscal accountability.  He leveraged his knowledge of computer languages and databases to integrate agency records and facilitate user access to the Agency's Management and Execution Tracker application.  Lastly, his subject matter expertise was critical in saving the agency over 1600 man-hours per year and reducing duplicated efforts. The distinctive accomplishments of Staff Sergeant Vane reflect credit upon himself, the United States Marine Corps Reserve, and the Department of Defense.

**Attachment 1**



# THE UNITED STATES OF AMERICA

TO ALL WHO SHALL SEE THESE PRESENTS, GREETING:

THIS IS TO CERTIFY THAT
THE SECRETARY OF DEFENSE
HAS AUTHORIZED THE AWARD OF THE

# JOINT SERVICE COMMENDATION MEDAL

TO

STAFF SERGEANT RUSSELL R. VANE, UNITED STATES MARINE CORPS RESERVE

FOR

MERITORIOUS SERVICE

FOR THE ARMED FORCES OF THE UNITED STATES

GIVEN UNDER MY HAND THIS   8ᵗʰ   DAY OF   NOVEMBER   2016



SECRETARY OF DEFENSE
LINDA R. URRUTIA-VARHALL, MAJ GEN, USAF
DIRECTOR OF OPERATIONS

NATIONAL GEOSPATIAL-INTELLIGENCE AGENCY
PERMANENT ORDER #16-135
_____
COMMAND OR OFFICE

DD FORM 2413, MAY 1999

**Attachment 1**



**NATIONAL GEOSPATIAL−INTELLIGENCE AGENCY**

7500 GEOINT Drive
Springfield, Virginia 22150

SPECIAL ORDER 16-135                                    31-Jan-17

By direction of the Secretary of Defense under provisions of Department of
Defense Manual 1348.33-M, September 1996, announcement is made of the
following decoration:

Name: Vane, Russell R.

Rank: SSgt

SSAN: ████████████

PASCODE/UIC/RUC:   03008

Service: USMCR

Decoration: Joint Service Commendation Medal

Decoration #: BASIC

Date(s) or period of service: 15 April 2016 to 31 October 2016

Reason: REFRAD

Condition: Meritorious service

                                    FOR THE COMMANDER



                                    SOPHIA M. CUMMINGS
                                    PO1, U.S. NAVY
                                    HDMP NAVY PROGRAM OFFICER

DISTRIBUTION:
NDBDM
Individual

**Attachment 1**