UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 1:24-cr-101 |
| RUSSELL RICHARDSON VANE, IV, | Hon. Anthony J. Trenga |
| | Sentencing Hearing: November 13, 2024 |
| Defendant. | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States of America, through undersigned counsel, in accordance with 18 U.S.C. § 3553(a), hereby files this Position with Respect to Sentencing in the instant case. The defendant was convicted on August 21, 2024, pursuant to a guilty plea agreement, of Count Three of the charged Indictment, possession of a select agent, specifically ricin, by an unregistered person, in violation of 18 U.S.C. § 175b(c)(1). The government submits this memorandum in advance of the defendant's sentencing hearing, currently scheduled for November 13, 2024. For the reasons explained below, the government respectfully requests that the Court sentence the defendant to a term of imprisonment at the low end of the Guidelines range, as well as a term of three years of supervised release to commence following the defendant's release from incarceration.

I.     **FACTS**

Since 2008, Russell "Duke" Vane worked in or adjacent to the intelligence community. PSR ¶¶ 88-92. At the time of the commission of the instant offense, he worked for a U.S. government intelligence agency as a data scientist. PSR ¶ 88. The defendant has had a life-long interest in chemistry, and a seeming fascination with how science can be used to create toxins and

1

weapons. The PSR details several incidents apart from the instant offense where the defendant used household materials to make dangerous substances as a science experiment—one where he showed neighborhood children to make black powder during a COVID pod science lesson, PSR ¶ 39, and another where he showed his son how to make "the gas that Hilter used." PSR ¶ 71. In early 2022, after the Russian invasion of Ukraine, the defendant became very fearful of the possibility of nuclear war or other mass destabilizing event, and to assuage some of his fears, he developed a fascination with militia and prepper groups, which he saw a potential stabilizing force in the event of catastrophe.

As this fascination developed, the defendant became involved with the Virginia Kekoas Militia (hereinafter "Kekoas"), a prepper group mostly active in the Norfolk, Virginia area. The Kekoas hold protests and rallies in the central and eastern Virginia area, often related to their Second Amendment rights. PSR ¶ 20. The investigation into the defendant began when alarming news reports began to circulate that the defendant had been removed from the group because they believed that he was a member of law enforcement attempting to entrap them into committing explosive-related crimes. PSR ¶¶ 19, 21.

It transpired that the defendant had begun to ask members of the Kekoas disturbing questions about whether they would be interested in creating homemade explosives, which would generally be illegal to create or possess. *See* PSR ¶¶ 25-26. Eventually, he printed out pages of Defense Intelligence Agency documents relating to explosive precursors, and handed to them to one Kekoas member in a manila envelope marked "Confidential: For Official Use Only." PSR ¶ 27. For the Kekoas, this was the last straw. Perhaps because of the defendant's clean-cut, military appearance, or perhaps because he had claimed to have worked for an intelligence agency, PSR ¶

2

21, the Kekoas assumed he must be a law enforcement plant, sent to entrap them into committing explosives-related crimes—and they did not want to be fooled.

After the news reporting surfaced about the defendant's alarming behavior, the government obtained a warrant to search his residence. During the execution of the warrant, on April 10, 2024, FBI agents searched a cardboard box on a shelf in the laundry room, where they found a bag of castor beans, laboratory equipment, and a test tube full of a grainy, off-white substance that eventually tested positive for ricin in its most toxic form. A follow-on search warrant was obtained, and the defendant arrested shortly thereafter.

The government later learned that the defendant had made the ricin more than a year before, in January 2023. He found instructions for making the ricin using searches conducted on his workplace computer, obtained a bag full of castor beans, and conducted his experiment. It was successful. But the defendant was not able to obtain the test strips he needed to determine for himself whether he had succeeded. He packaged away the castor beans, supplies, and test tube, disposed of the other byproducts, and left the box in his home, where it sat until it was discovered during the April 2024 search.

On June 26, 2014, a federal grand jury convening in the United States District Court for the Eastern District of Virginia returned a 4-count Indictment charging the defendant with one count of production of ricin for use as a weapon, in violation of 18 U.S.C. § 175(a); one count of possession of ricin for a non-peaceful purpose, in violation of 18 U.S.C. § 175(b); one count of possession of a select agent by an unregistered person, in violation of 18 U.S.C. § 175b(c)(1), and one count of distribution of bomb-making materials, in violation of 18 U.S.C. §842(p).

The defendant pled guilty pursuant to a plea agreement on August 21, 2024, to Count 3 of the Indictment. He is now before the Court for sentencing.

## II. SENTENCING ANALYSIS

### A. Sentencing Guidelines

Although the Sentencing Guidelines are now advisory, sentencing courts nevertheless "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005); *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264). Thus, at sentencing a court "must first calculate the Guidelines range." *Nelson v. United States*, 555 U.S. 350, 351 (2009); *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Then, relying on that Guidelines range as "the starting point and the initial benchmark," the sentencing court must then "consider all of the [18 U.S.C.] § 3553(a) factors" in fashioning and imposing an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *United States v. Blue*, 877 F.3d 513, 517 (4th Cir. 2017).

Here, the Presentence Investigation Report (PSR) prepared by the United States Probation Office has correctly calculated the applicable final offense level as 19, and the defendant's Criminal History Category as I. The combination of the defendant's offense level and Criminal History Category yields a Sentencing Guidelines imprisonment range of 30-37 months. PSR ¶ 99. The government has no objection to the Sentencing Guidelines calculation contained in the PSR. The defendant has one substantive objection to the Guidelines calculations, discussed below. The government respectfully submits, however, that the PSR has correctly calculated the Guidelines range, and that range should be applied by the Court at sentencing.

The defendant argues that he should receive a two-level reduction to his offense level pursuant to USSG §4C1.1 for being a "Zero-Point Offender," which he is not eligible for if the crime involves possession of a dangerous weapon. He argues that the ricin he possessed is not a dangerous weapon as defined in the relevant application note, because it is not capable of

4

"inflicting death or serious bodily injury." *See* App. n.1(E), 1B1.1. But the defendant's own expert report contradicts this position. The report explains that 30 milligrams of ricin would be necessary to produce toxicity through ingestion. Dkt. 59, Exhibit 1, p. 1. The defendant had 12.4 grams.

It is true that the ricin created by the defendant was likely not capable of being aerosolized, because the particle sizes were not small enough. That would be the most common method of using ricin as a mass casualty bioweapon. Nor did the defendant have any device he could have used to inject the ricin into a victim. But ricin is also toxic when ingested, and capable of inflicting death or serious bodily injury simply by swallowing the contents of a test tube. Just because a bioweapon exists in a form less toxic than the *most* toxic possible form does not mean that it is not *capable* of inflicting death or serious bodily injury. The PSR properly applies the exception to the "Zero-Point Offender" reduction, and the appropriate Guidelines range is 30-37 months.

### B.  18 U.S.C. § 3353(a) Factors

After calculating the Guidelines range, a sentencing court must consider that range and the sentencing factors set forth in § 3553(a) to determine an appropriate sentence. *Nelson*, 555 U.S. at 351. These factors include the nature and circumstances of the offenses; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offenses and afford adequate deterrence. 18 U.S.C. § 3553(a). Based upon consideration of these factors and for the reasons that follow, the United States respectfully recommends that the Court impose a term of imprisonment of 30 months, representing a sentence at the low end of the imprisonment range suggested by the Sentencing Guidelines.

*1.     Nature and Circumstances of the Offense*

The defendant's offense is extraordinarily serious. He manufactured a deadly biotoxin and stored it in his home, where he risked exposing his wife and young children to the toxic substance. The defendant notes the fact that the crime of conviction is much less serious than the scenarios initially contemplated by the government when law enforcement first learned of the defendant's activities.  That is true, as far as it goes.  The defendant didn't turn out to be a terrorist, or planning a mass casualty attack, or even plotting a murder.  Rather, he exercised some terrible judgment, and synthesized a biotoxin out of—essentially—curiosity.  But the fact that his activities proved to be less serious than the *most* serious possible offenses one could commit with ricin does not mean that producing ricin, in and of itself, is *not* incredibly serious.  That serious conduct merits a serious sentence.

*2.     The History and Characteristics of the Defendant*

It is not difficult to see how the defendant wandered down the path into committing this crime.   He has a life-long interest in science, and a history of exercising his curiosity by learning about and conducting chemistry experiments with substances that tend toward the dangerous, whether it be black powder, homemade explosives, toxic gases, or ricin.   He has explained in his own submission how his anxiety around world events spiraled out of control, and how he used experiments like these to help manage his anxiety—they gave him a feeling of control and security. Hopefully he has now learned that such conduct leaves him and his family *less* secure, and he will conduct no further such experiments in the future.  But those very characteristics—his impulsivity and lack of judgement—will still haunt him.  This was not one isolated mistake, but a pattern of behavior.  Not all of those behaviors were illegal in and of themselves.  Making black powder as a science experiment for a group of neighborhood children shows terrible

6

judgement, but it is not a crime. Nor did the defendant's interactions with the Kekoas rise to the level of a crime—but they were bizarre and alarming, and had the potential to spiral rapidly out of control: what if he had joined a group that *did* decide to take him up on his offer to make homemade explosives? These erratic and ill-considered actions form a pattern of behavior, of which the production of ricin was just one example, and it would be reductive to treat the defendant's crime as an outlier, an uncharacteristic mistake.

There is much that is laudable about the defendant's history of service. He had a long and respectable military and intelligence career. He was consistently polite and courteous with the agents who conducted the search of his home and eventually arrested him; as soon as he was given the opportunity, he came voluntarily to the government to explain his conduct and assure law enforcement that he meant no harm to the community. But his history of service cuts in the other direction as well. In short, *he should have known better*.

It defies belief that a man who has worked for well over a decade in the military and in the field of counterterrorism did not know that it was illegal to make ricin. *See* PSR ¶ 47, Dkt. 57 at 9. The handbooks and recipes the defendant himself printed and read make it clear.[1] Even if it is true, as he claims, that he did not know that ricin was illegal to possess, the good judgement called for by and developed throughout his career should have stopped him. It did not. And he still cannot fully explain why. He claims he doesn't know what he was thinking; that he was "not himself." But that gives little assurance to the Court that he will not make some similar decision again.

---

[1] For instance, the final page of the "Ricin: Kitchen Improvised Devastation" chapter of "Silent Death," one of the documents the defendant printed, reads, "Warning: Possession of refined ricin will likely get you a life term!"

7

The United States believes that capping the defendant's sentence at the low end of the Guidelines is appropriate here to credit the defendant for his prompt acceptance of responsibility. But beyond that, his history and circumstances call for a meaningful sentence of incarceration.

3.  *Need for Sentence to Promote Respect for the Law and Afford Adequate Deterrence*

The seriousness of the offense and the need to provide just punishment is obvious from a mere recitation of the facts of this case. The need to promote respect for the law and need to deter similar criminal conduct do merit particular attention, however.

The defendant is plainly remorseful. He understands the impact that his behavior has had- on his security clearance, his career, and his family. Perhaps he himself needs no further deterrence to prevent him from reoffending—though, as noted above, the fact that he acted so impulsively, and still claims to not understand the motivation behind his own actions, suggests that the risk to the community is not fully mitigated. But more importantly, the sentence in this case needs to send a strong message to the community—that this behavior is unacceptable, and that those who engage in it will swiftly and soundly be held accountable. A sentence of time served, or home confinement, would do the opposite. It would suggest to others that they can manufacture biotoxins in their kitchens and expect to go home after their conviction. Instead, a Guidelines range custodial sentence would send an appropriate signal to others considering this sort of behavior that the law does not tolerate this sort of activity.

4.  *Sentencing Guidelines Range and Unwarranted Sentence Disparities*

18 U.S.C. § 3553(a)(4) instructs a sentencing court to consider the Sentencing Guidelines range applicable to the defendant. For the reasons discussed above, the Government respectfully submits that the PSR properly calculates the Sentencing Guidelines range as 30-37 months.

There exist, as the defendant appropriately identifies in his own sentencing position paper, only a limited number of cases involving this particular statute. The defendant identifies two similar cases in which the defendants received between 35 and 37 month sentences- higher than the low end of the Guidelines that the government has recommended here. The defendant also notes the *United States v. Milzman* case out of Washington D.C., where a college student manufactured ricin in his dorm room, planning to use it to die by suicide. That defendant was sentenced to a year and a day's incarceration, something of an outlier here, but perhaps appropriate given the serious mental health condition of the defendant in that case. A 30-month sentence here would be commensurate with, and not greater than, those imposed on defendants in other similar cases.

## CONCLUSION

For the foregoing reasons, the United States respectfully recommends the Court impose a sentence of 30 months' imprisonment, to be followed by a three-year term of supervised release to satisfy the factors enumerated in 18 U.S.C. § 3553(a).

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____/s/_____
Danya E. Atiyeh
Virginia Bar No. 81821
Amanda St. Cyr
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Email: danya.atiyeh@usdoj.gov

CERTIFICATE OF SERVICE

      I hereby certify that on November 6, 2024, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record.

                                                    /s/
                                         Danya E. Atiyeh
                                         Assistant United States Attorney